LOREN SCHERPING, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; LAVERNE SCHERPING, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Scherping v. Commissioner
Docket Nos. 31030-86; 31051-86
United States Tax Court
T.C. Memo 1989-678; 1989 Tax Ct. Memo LEXIS 678; 58 T.C.M. (CCH) 1046; T.C.M. (RIA) 89678; December 27, 1989
John R. Koch, for the petitioners. John C. Schmittdiel, for the respondent. COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION COLVIN, Judge: The issue for decision is whether the purported corporate purchaser of petitioners' farm assets should be recognized as a separate entity for tax purposes. As will be discussed, we hold that the corporation was not a separate taxable entity and that petitioners' "sale" of farm assets was a sham. Respondent determined deficiencies in and additions to petitioners' federal income tax as follows: Loren Scherping
Additions to Tax
Year
Deficiency
§ 6651(a) [1]
§ 6653(a)(1)
§ 6653(a)(2)
§ 6654
§ 6661
1981
$ 63,670
$ 15,918
$ 3,184
*
$ 1,902
--
1982
63,097
15,774
3,155
*
1,623
$ 6,310
1983
67,096
16,774
3,355
*
1,227
6,710
*680 LaVerne Scherping
Additions to Tax
Year
Deficiency
§ 6651(a)(1)
§ 6653(a)(1)
§ 6653(a)(2)
§ 6654
§ 6661
1981
$ 51,178
$ 12,794
$ 2,559
*
$ 1,529
--
1982
60,690
15,173
3,035
*
1,562
$ 6,069
1983
64,568
16,142
3,228
*
1,181
6,457
After concessions, there are three issues for decision: (1) The primary issue is whether petitioners are taxable on income paid in 1983 to Imperial Investments, Inc. ("Imperial"), an entity to which petitioners allegedly transferred ownership and control of their dairy farm assets in March 1983. We hold that petitioners are taxable on such income because we find that Imperial was not a separate taxable entity. We also find that the purported sale of assets to Imperial had no legitimate business purpose *681 and was merely an attempt by petitioners to avoid Federal individual income tax. (2) We also must decide whether petitioner Loren Scherping must have his tax liability for each of the taxable years 1981, 1982, and 1983 computed using the married filing separate rates. We hold that he is not entitled to compute his income tax liability for the years 1981-1983 using married filing jointly rates because he did not file Federal income tax returns for those years in which he made a proper election. (3) Finally, we must decide whether petitioner Loren Scherping is entitled to compute his tax liability for taxable year 1983 using income averaging. We hold that he is not entitled to income average for the taxable year 1983 because he cannot compute his minimum base period income in accordance with section 1304(c)(2). FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners resided in Freeport, Minnesota, at the time they filed their petition in this case. Petitioners are brothers who did not file Federal income tax returns for 1981, 1982, and 1983. At the end of 1981, 1982, and 1983, Loren Scherping was married and LaVerne Scherping was single. Petitioner *682 Loren Scherping is entitled to three dependency exemptions in 1981 for his wife and two children, and four dependency exemptions in 1982 and 1983 for his wife and three children. During 1981, 1982, and the first 5 months of 1983, petitioners owned and operated a dairy farm known as Green Acre Farm. Petitioners each took 50 percent of the profit or loss. The farm has been owned and operated by petitioners and their parents since at least 1948. During the first 5 months of 1983, Green Acre Farm had gross milk receipts and cooperative deductions as follows: Gross Receipts
$ 133,825.92
Less: Capital Retain
1,323.69
Hauling
939.24
Farm supplies
144.70
Sales tax
8.42
Freeport Creamery
11,109.42
MN Dairy Promotion
669.13
USDA Price Support
1,457.01
Net Payment
$ 118,174.31
Green Acre Farm incurred the following expenditures during the first 5 months of 1983: Repairs and Maintenance
$ 1,561.24
Fertilizers and Chemicals
8,501.68
Gasoline and Oil
3,247.81
Seed
2,216.60
Veterinary Fees
999.55
Bank Charges
91.99
Supplies and Parts
3,781.31
Utilities
4,525.07
Insurance
200.40
Rent
2,080.00
Labor
4,800.00
Total:
$ 32,005.65
*683 Green Acre Farm also made the following expenditures during the period January through May 1983 for purchases of capital improvements: Date Paid
Amount
Payee Description
1/19/83
$ 10,000.00 Freeport Implement
Hay Conditioner
2/14/83
22,500.00 Freeport Implement
Tractor 3/1/83
610.00 Scherping Electric
--
3/25/83
2,019.68 Freeport Implement
Cornhead
5/10/83
680.00 Hennen Building
--
5/28/83
16,800.00 Thull Excavating
Field Tilling  5/30/83
697.00 Ed Rosinger
--
Imperial Investments, Inc., filed articles of incorporation with the State of Minnesota on February 13, 1980. Walter Moorhouse, Walter Bechik, and Joyce Bechik constituted Imperial's first Board of Directors. On April 29, 1983, Walter Moorhouse, Walter Bechik, and Joyce Bechik were replaced by Daniel Strohmeier (hereinafter "Strohmeier"), Judy L. Weber, and Janna Carlson as the directors of Imperial. Strohmeier, Weber, and Carlson were elected president, vice-president, and secretary/treasurer, respectively. Judy Weber is the wife of Dwaine Weber, and Janna Carlson is a friend of James Noske who later replaced Strohmeier as president of Imperial on August 20, 1987. *684 On May 24, 1983, petitioners Loren Scherping and LaVerne Scherping allegedly "sold" their farm equipment and livestock to Imperial in a cash sale for the sum of $ 582,265. The purported closing was held at attorney John Mack's office and was attended by petitioners; petitioner Loren Scherping's wife, Jane Scherping; James Noske's sister, Joan Noske; Dwaine Weber; Ken Schreiner; and John Mack. At that time, petitioners signed a number of documents including bills of sale, a list of the farm items being sold, and a receipt for the money they received. Strohmeier was taken from an alcoholic treatment center in June 1983 by James and Joan Noske and placed by them on petitioners' family farm. Originally, Walter Bechik held all the outstanding shares of Imperial. However, on April 29, 1983, the stock was transferred to Strohmeier (334 shares), Weber (333 shares), and Carlson (333 shares). Prior to Strohmeier's release from the treatment center, Dwaine Weber visited him and informed him that he would be made head of Imperial. Subsequently, Strohmeier, as president of Imperial, signed numerous documents, sometimes in blank, at the direction of either James and Joan Noske or John *685 Mack. Strohmeier lived and worked on petitioners' farm during the last half of 1983. During this time, Strohmeier hauled silage, milked cows, painted, and performed other menial farm chores, all at the direction of petitioners. In addition, petitioners set down various rules for Strohmeier; for example, he had to attend AA meetings, and he was not permitted to smoke in the house where he lived with LaVerne and Mrs. Scherping, petitioners' mother. Subsequent to 1983, Strohmeier did not live at petitioners' farm but continued to perform tasks and sign papers as president of Imperial at the direction of James and Joan Noske and Mr. Koch. Strohmeier never conducted any banking for Imperial and only handled cash for Imperial under the careful watch of petitioners or James and Joan Noske. Imperial's mailing address was a post office box in Cold Spring, Minnesota. Strohmeier and James and Joan Noske had access to that box. Strohmeier sometimes picked up the mail for Imperial at that box, but he always dropped the mail off at the Noskes' residence. Strohmeier was never notified of any meetings of the officers and directors of Imperial during 1983 or the remainder of his presidency. *686 Strohmeier signed an undated resignation from his position as president of Imperial when he was made president of that corporation. Strohmeier picked up numerous items for petitioners' farm and signed receipts acknowledging receipt of the merchandise, all at the direction of petitioners. Strohmeier did not participate in any manner in the alleged purchase by Imperial of petitioners' farm equipment and livestock and was unaware of such purchase by Imperial. After May 24, 1983 (the date of the alleged sale to Imperial), and continuing throughout that year, petitioners continued to live and work on their farm, performing substantially the same work as they did before May 24, 1983. During 1983, the only persons to work on petitioners' dairy farm were petitioners, members of their immediate family, and occasionally Strohmeier. During the period June 1, 1983 through December 31, 1983, petitioners had gross milk receipts and cooperative deductions as follows: Gross receipts
$ 153,864.82
Less: MN Dairy Promotion Board
767.66
Commodity Credit
8,605.25
Hauling
1,500.00
Miscellaneous Common Share
1.00
Soaps
129.75
Sales Tax
7.80
Net Payment
$ 142,853.36
*687 The net payment shown above was made by Modern Craftsman Milk Association (MCMA) by check to Imperial. The checks paid by MCMA to Imperial for milk receipts were delivered twice monthly to petitioners' dairy farm and left on the bulk milk storage tank. Strohmeier did not take the check from the top of the bulk tank. Loren and LaVerne Scherping were the only other persons who worked in, and had access to, that area. The checks made payable to Imperial by MCMA in 1983 were endorsed by a stamp with the imprint "Imperial Investments, Inc., by Dan Strohmeier, President." Strohmeier never controlled nor gave permission to anyone to use this signature stamp. Strohmeier did not manage Imperial. All important and day-to-day decisions regarding the farm and its operation were made by petitioners. James Noske, Joan Noske, and Walter Moorhouse were named defendants in a civil injunction brought by the United States under section 7408 to enjoin them from selling and promoting "an abusive tax shelter plan involving business trusts." Other named defendants in the action included Cheri Moorhouse, Cheryl Foshaug, Armageddon, Inc., Marti Inman, Parnell, Inc., Richard Hall, and Mission, *688 Inc. The United States District Court for the District of Minnesota, in an unreported decision, found that the Noskes had engaged in the alleged conduct and enjoined them from such conduct in the future. United States v. Moorhouse, No. 6-84-853 (D. Minn., Nov. 16, 1985). Loren Scherping, his brother and his mother transferred their farm real estate to a trust known as C.G.S. Ranch in 1981; Loren Scherping received 33 1/3 trust certificates (one-third the total number of such certificates) in exchange for such transfer. C.G.S. Ranch was one of the business trusts sold by James Noske and the other defendants in the previously referred to section 7408 injunction action. On a lease document setting forth a lease of the Scherping farmland between C.G.S. Ranch and Imperial, the lessors' signature was executed by Cheryl Foshaug and Marti Inman as the respective presidents of Armageddon, Inc., and Parnell, Inc.
On July 5, 1983, an account was opened at the State Bank of Cold Spring in the name of Imperial Investments, Inc. During the period July 5, 1983, through October 14, 1983, when the account was closed, the following deposits were made to the account: Payor
Amount
Granite City Livestock
$ 16,571.00
Haas
977.00
Midwest Sport
41.00
Gjesvold
1,088.00
MN Dairy Promotion Board
131.00
Schmitz
400.00
$ 19,208.00
*689 Petitioners sold cattle through Granite City Livestock both before and after May 24, 1983. On May 2, 1983, this Court entered a decision against Loren Scherping in docket No. 1637-83 deciding a deficiency in income tax for 1980 in the amount of $ 48,076 and additions to tax under sections 6651(a), 6653(a), and 6654 in the amounts of $ 12,019, $ 2,404, and $ 938, respectively. On May 2, 1983, in docket No. 1638-83, this Court decided that LaVerne Scherping was liable for a deficiency in income tax for 1979 in the amount of $ 34,435 and an addition to tax under section 6653(a) in the amount of $ 1,722. This Court also decided that for 1980 LaVerne Scherping was liable for a deficiency in income tax in the amount of $ 44,612 and additions to tax under sections 6651(a), 6653(a), and 6654 in the amounts of $ 11,153, $ 2,231, and $ 870, respectively. On May 3, 1983, a decision was entered by this Court against Loren Scherping and his wife Jane Scherping in docket No. 1642-83 deciding they had a deficiency in income tax for 1979 in the amount of $ 32,079 and an addition to tax under section 6653(a) in the amount of $ 1,604. Petitioners had not paid their income tax liabilities *690 for 1979 and 1980, as determined by this Court on May 2 and 3, 1983, when they conveyed their farming assets to Imperial on May 24, 1983. In 1983 petitioners' farming partnership had cost recovery and depreciation deductions of $ 69,927, and investment credit of $ 5,407. In addition, petitioners' farming partnership received interest income of $ 286, and a patronage dividend in 1983 of $ 1,053. Petitioners' farming partnership had net taxable income in 1983 as shown below: Milk Receipts - Mid America
$ 133,825.92
MCMA
153,864.82
$ 287,690.74
Less: Hauling
$  2,439.24
Farm Supplies
144.70
Sales Tax
16.22
MN Dairy Promotion
1,436.79
Freeport Creamery
11,109.42
USDA Price Support
1,457.01
Misc.
1.00
16,604.38
Net Milk Receipts
$ 271,086.36
Patronage Dividend
1,053.48
Interest Income
286.00
Livestock Sales
16,571.00
Other Income Deposited
2,637.00
Gross Income
$ 291,633.84
Deductions:
Repairs & Maintenance
$  1,561.24
Fertilizers & Chemicals
8,501.68
Gasoline & Oil
3,247.81
Seed
2,216.60
Veterinary Fees
999.55
Bank Charges
91.99
Supplies & Parts
3,781.31
Utilities
4,525.07
Insurance
200.40
Rent
2,080.00
Labor
4,800.00
Depreciation (# 54)
69,927.00
101,932.65
Partnership Taxable Income
$ 189,701.19
*691 On December 5, 1988, petitioner Loren Scherping and his wife, Jane Scherping, filed a declaration [2] with the Internal Revenue Service through which they attempted to elect to file married filing jointly for taxable years 1981, 1982, and 1983. Ultimate Findings of Fact
1. Petitioners made all of the management decisions concerning the farm, even after the purported sale of the farm equipment and livestock to Imperial. 2. The purported sale had no legitimate business purpose and was merely an attempt by petitioners to avoid Federal individual income tax. OPINION Are petitioners taxable on income realized in connection with Green Acre Farm which was nominally paid to Imperial? The first issue to decide is whether Imperial *692 should be recognized as a separate taxable entity or whether income nominally received and claimed by Imperial as taxable to it is property taxable to petitioners. It is well settled that income is taxable to the person who earns it. Lucas v. Earl, 281 U.S. 111 (1930). In determining the true earner of income, substance controls over form because "The incidence of taxation depends upon the substance of a transaction." Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945). Thus, although petitioners purportedly sold farm equipment to Imperial, we must decide whether petitioners continued to own and control the farm assets and the income resulting therefrom. Even if we determine that Imperial is a separate taxable entity, respondent argues that petitioners still may be liable for income earned by Imperial under an assignment of income theory. Lucas v. Earl, supra;Haag v. Commissioner, 88 T.C. 604, 610-611 (1987), affd. without published opinion 855 F.2d 855 (8th Cir. 1988). Petitioners contend that *693 they sold the assets of Green Acre Farm to Imperial on May, 24, 1983 for $ 582,265 and that Imperial was a viable corporate entity for tax purposes. Respondent maintains that Imperial should not be recognized as a separate taxable entity because petitioners failed to relinquish either ownership or control of their farm assets to Imperial, Imperial was formed for no legitimate business purpose, and was merely intended to serve as a vehicle for petitioners' tax avoidance. Respondent argues that the purported sale was a sham. In the alternative, respondent argues that even if Imperial is recognized as a separate taxable entity, the income paid to it during the last 7 months of 1983 should be taxed to petitioners since that income was the product of their labor and capital. While a taxpayer is free to adopt the corporate form of doing business, a corporation must engage in some meaningful business activity to be recognized as a separate entity for tax purposes. Avoiding taxation is not a business activity. National Carbide Corp., 336 U.S. 422, 437 n. 20 (1949); National Investors Corp. v. Hoey, 144 F.2d 466, 468 (2d Cir. 1944). *694 See also Higgins v. Smith, 308 U.S. 473 (1940); Gregory v. Helvering, 293 U.S. 465 (1935). The evidence fails to show that petitioners genuinely received fair consideration for the alleged sale of their farm assets. There is no evidence in the record indicating that Imperial provided the nearly $ 600,000 it allegedly paid to petitioners for the farm assets. At trial, there was contradictory testimony regarding the actual amount of cash and money orders present at closing, who counted the money, and the size and color of the suitcases in which the money was brought to the closing. Petitioners testified that they received equal shares of the sales proceeds. However, petitioners were evasive when questioned about their disposition of the proceeds, and we find it difficult to believe that both petitioners could or would squander such a large sum of money in such a short time and with nothing to show for it. Petitioners continued to manage and operate the farm the same as before the May 24, 1983, "sale" to Imperial. Even if petitioners validly conveyed title in their farm assets to Imperial in May 1983, the conveyance was a sham for Federal income *695 tax purposes because petitioners, rather than Imperial, continued to own and control the farm assets. The transfer of farm assets to Imperial was a sham. The transfer of farm equipment and livestock by petitioners to Imperial was a sham because it lacked any legitimate business purpose, it was done solely as a vehicle for tax avoidance, Imperial was not, in fact, shown to have been able to have paid any consideration for petitioners' farm assets, petitioners continued to manage the farm after the sale, and Imperial was not shown to have conducted any directors or officers meetings and was controlled through a puppet corporate president, Daniel Strohmeier. We assume for purposes of discussion that Imperial was formed in compliance with most or all of the formalities under Minnesota law for incorporating a corporation. However, it is clear that a corporation, even though purportedly organized under the laws of a State, may be disregarded for Federal tax purposes if it is no more than a vehicle for tax avoidance and void of any legitimate business purpose. Gregory v. Helvering, 293 U.S. 465 (1935); *696 American Savings Bank v. Commissioner, 56 T.C. 828, 838 (1971); Aldon Homes, Inc. v. Commissioner, 33 T.C. 582 (1959). A corporation that conforms to all of the statutory requirements but with no purpose other than tax avoidance will be ignored for tax purposes. Gregory v. Helvering, supra.
There is little evidence to show that Imperial itself, apart from petitioners, Strohmeier, and the Noskes, engaged in any substantive business activities with respect to the Scherping farm during 1983 or subsequently. Strohmeier's testimony, which we believe was credible in this respect, supports the conclusion that Imperial was merely a shell designed to mask petitioners' continuing farming activities as well as to shield them from any personal tax liability. [3]
In contrast, we do not find credible James Noske's *697 testimony that Imperial made the management decisions regarding the farming operations and that petitioners were merely laborers in the farm's dairy operation. In this regard, we note that Noske also testified that before becoming president of Imperial in August 1987, he had no prior involvement with Imperial -- a fact we find incredible. [4]
Although MCMA paid for the milk by checks payable to Imperial, the record does *698 not show that Imperial was the ultimate recipient of the funds. The checks were endorsed with a stamp bearing Daniel Strohmeier's signature and could, in fact, have been endorsed by anyone who had access to both the checks and signature stamp. Strohmeier testified that petitioners or the Noskes used the stamp. Petitioners had previously used a similar stamp to endorse items for Green Acre Farm. In view of the manner of delivery and endorsement of the checks from MCMA, we find that petitioners, not Imperial, controlled the milk monies received from MCMA. "The issue of who is the owner of property for income tax purposes is a question of fact which must be determined upon an examination of all the facts and circumstances." Beran v. Commissioner, T.C. Memo. 1980-119; see Schoenberg v. Commissioner, 302 F.2d 416 (8th Cir. 1962), affg. a Memorandum Opinion of this Court; Snyder v. Commissioner, 66 T.C. 785 (1976). "The crucial question remains whether the assignor retains sufficient power and control over the assigned property or over the *699 receipt of the income to make it reasonable to treat him as the recipient of the income for tax purposes." Commissioner v. Sunnen, 333 U.S. 591, 604 (1948); Hutcherson v. Commissioner, T.C. Memo. 1984-165. Strohmeier testified that he had had several drinks earlier in the day before testifying. The Court observed and listened to Strohmeier's testimony. He was competent to testify. While we find Strohmeier to be a competent witness, it is implausible that he would be made the president of a corporation which operated a farm of this size and complexity. Strohmeier was a most unlikely candidate to be entrusted with running this farm. Indeed, as the evidence clearly shows, Strohmeier was a mere figurehead who was supervised by petitioners and the Noskes and who acted entirely at their direction. In addition, notwithstanding petitioners' elaborate charade, the fact that petitioners signed bills of sale and allegedly received a large sum of money from Imperial in consideration for the farming assets, coupled with the change in name of petitioners' farm after its incorporation by Imperial, is not enough to lend validity to petitioners' alleged *700 transfer to Imperial. Merely laying a paper trail is not enough to establish that a true sale has taken place. In addition, petitioners' attempts to establish the bona fides of their "sale" to Imperial through testimony regarding Imperial's formation and alleged legitimate business purposes do not lend substance to that "sale." Because we have found that petitioners' transfer of farm assets to Imperial was a sham, we need not reach respondent's assignment of income argument. Petitioner Loren Scherping is not entitled to compute his income tax liability using joint return rates. Petitioner Loren Scherping contends that he and his wife, Jane Scherping, are entitled to use the joint return rates in computing their income tax liability for taxable years 1981, 1982 and 1983. He maintains that they meet the statutory requirements for joint filing status, i.e., they have taxable years beginning on the same day, neither is a nonresident alien, and they were not legally separated on the last day of 1981, 1982 or 1983. Secs. 6013(a), 6013(d)(2). In addition, Loren Scherping contends that the December 5, 1988, declaration he and his wife filed was an election of joint filing *701 status for taxable years 1981, 1982 and 1983. Respondent argues that Loren is not entitled to joint filing status because the Commissioner elected a separate filing status for him. Petitioner cites Millsap v. Commissioner, 91 T.C. 926, 938 (1988), for the proposition that substitute returns prepared by respondent under section 6020(b) do not "preempt or preclude petitioner's right to contest * * * petitioner's filing status under section 6013." We find petitioners' reliance on Millsap inapplicable here because in Millsap the taxpayer filed a valid joint return before the case was submitted for decision. Petitioners in the instant case have not filed returns, joint or otherwise, for the years in issue at any time. This Court has frequently stated that a joint return must be filed in order for taxpayers to elect the benefit of the joint return rates. Thompson v. Commissioner, 78 T.C. 558, 561 (1982). Although Loren and Jane filed a declaration electing joint filing status, they did not file income tax returns for the years 1981, 1982 and 1983. *702 We hold that the filing of a declaration is not sufficient to elect joint filing status and thus petitioner Loren Scherping did not properly elect to use the rates for married persons filing jointly for these years. This Court has determined that "if a taxpayer has not filed a return by the time his case is submitted for decision, it is too late for the taxpayer to file a joint return and elect joint filing status." Gudenschwager v. Commissioner, T.C. Memo. 1989-6; see Phillips v. Commissioner, 86 T.C. 433, 441 n.7, affd. and revd. on other issues 851 F.2d 1492 (D.C. Cir. 1988); Thompson v. Commissioner, supra.
Petitioner Loren Scherping and his wife did not properly elect joint filing status for the years in issue because they failed to elect by the only permissible method, i.e., filing joint income tax returns for those years. We hold that they may not belatedly elect the benefit of joint filing status by filing a declaration of joint status, and that respondent correctly used the rates for married persons filing separately to calculate petitioner Loren Scherping's tax liability for 1981, 1982 and 1983. *703 Petitioner Loren Scherping is not entitled to income average for taxable year 1983. Petitioner Loren Scherping claims that he is eligible to income average for taxable year 1983 since he was a United States citizen for that year, was not a nonresident alien at any time during 1983 or any of the 4 previous tax years, had "averagable" income for the computation year (1983) in excess of $ 3,000, and provided more than 50 percent of his own support for each of the 5 years (1979-1983) in question. Secs. 1301, 1302(c), 1303; sec. 1.1301-1, Income Tax Regs.
Respondent argues that Loren may not income average for 1983 because he failed to meet the requirements of section 1304(c)(2). Section 1304(c) requires a married individual to compute his minimum base period income in accordance with section 1304(c)(2)[5] provided he does not file a joint return for the computation year. Loren did not file a joint return for 1983. *704 Loren Scherping was married to Jane Scherping in the computation year 1983, and during each of the base period years, 1979 through 1982. Since he failed to file a joint return for 1983, Loren must compute his minimum base period income by taking into account the income and deductions of his wife, Jane Scherping, for the base period years. There is no evidence in the record as to the income and deductions of Jane Scherping for taxable years 1979, 1980, 1981 and 1982. Accordingly, Loren cannot establish his minimum base period income in accordance with section 1304(c)(2), and thus cannot establish that he has "averagable" income in excess of $ 3,000 for the computation year 1983 pursuant to section 1301. We find that petitioner Loren Scherping is not entitled to income average for taxable year 1983. Decisions will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years at issue. 50 percent of the interest due on $ 51,178, $ 60,690, and $ 64,568 for 1981, 1982, and 1983, respectively.
*↩ 50 percent of the interest due on $ 63,670, $ 63,097, and $ 67,096 for 1981, 1982, and 1983, respectively. 2. Petitioner Loren Scherping and his wife Jane Scherping filed the following declaration dated December 5, 1988: DECLARATION We, the undersigned, hereby declare that we elect under Section 6013 of the Internal Revenue Code to file married filing jointly for the tax years ended December 31, 1981, December 31, 1982 and December 31, 1983. (signed) Loren Scherping 12/05/88 (signed) Jane Scherping 12/05/88↩
3. In view of the large deficiency determination entered against petitioners in early May 1983 for tax years 1979 and 1980, petitioners' transfer of their farm assets to Imperial may have been prompted by concern over their impending tax liabilities and thus a misguided attempt to defeat collection or avoid payment of tax.↩
4. We base our conclusion as to Noske's credibility as a witness solely on the record before us in the instant case. However, we note that this is not the first tax shelter litigation involving Noske. See Xemas, Inc. v. United States, 689 F. Supp. 917 (D. Minn. 1988), affd. without published opinion 889 F.2d 1091 (8th Cir. 1989); Noske v. United States, 88-2 USTC par. 9582, 63 AFTR2d 89-367 (D. Minn. 1988). We also note that the United States District Court for the District of Minnesota, in an unreported decision, enjoined Noske from engaging in the organization, sale, or promotion of tax shelter business trusts pursuant to section 6700. United States v. Moorhouse↩, No. 6-84-853 (D. Minn., Nov. 16, 1985).
5. Section 1304(c)(2), as in effect during the years in issue, provides: (c) Failure of Certain Married Individuals To Make Joint Return, Etc. -- * * * (2) Minimum base period income. -- For purposes of this part, the base period income of an individual for any base period shall be not less than 50 percent of the base period income which would result from combining his income and deductions for such year -- (A) with the income and deductions for such year of the individual who is his spouse for the computation year, or (B) if greater, with the income and deductions for such year of the individual who was his spouse for such base period year.↩