# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-2009

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the |
| Laverne Scherping; Loren Scherping; | * | District of Minnesota |
| Jane Scherping; Epsilon Company; | * | |
| C.J.S. Ranch, | * | |
| | * | |
| Appellants. | * | |

_____

Submitted:  February 9, 1999

Filed:  August 11, 1999

_____

Before McMILLIAN, LAY and MURPHY, Circuit Judges.

_____

McMILLIAN, Circuit Judge.


Appellants are two brothers, Laverne Scherping and Loren Scherping, Loren's wife, Jane Scherping, and two business trusts, Epsilon Co. and C.J.S. Ranch. Appellants appeal from a summary judgment entered in the United States District

Court[1] for the District of Minnesota in favor of the United States (government), holding that the government was entitled to foreclose its tax liens upon appellants' property to satisfy their tax liabilities. United States v. Scherping, Civil File No. 97-2282 (PAM/JGL) (D. Minn. Mar. 9, 1998) (memorandum and order). For reversal, appellants argue that the district court erred in: (1) finding the collection action was not barred by the 6-year statute of limitations, (2) ordering a "reverse pierce" and imposing liability upon C.J.S. Ranch for tax obligations of the Scherpings, and (3) finding that the transfer of their property to Epsilon Co. was fraudulent because the transfer did not render them insolvent. For the reasons discussed below, we affirm the judgment of the district court.

## JURISDICTION

The district court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1340 (original jurisdiction of civil action arising under any Act of Congress provision for the Internal Revenue), 1345 (original jurisdiction of all civil actions, suits, or proceedings commenced by the United States), and 26 U.S.C. § 7402 (action to reduce to judgment tax assessments and foreclose tax liens against property). This court has appellate jurisdiction pursuant to 28 U.S.C. § 1291. Appellants timely filed a notice of appeal. Fed. R. App. P. 4(a)(1).

## FACTUAL BACKGROUND

This case has a long, checkered history, involving numerous tax court proceedings. Laverne Scherping and Loren Scherping (taxpayers), who are brothers, unsuccessfully appealed the two tax court cases from which this collection action arises to this court. See Scherping v. Commissioner, 747 F.2d 478, 480 (8th Cir. 1984) (per

---

[1]The Honorable Paul A. Magnuson, Chief Judge, United States District Court for the District of Minnesota.

curiam) (Laverne Scherping); Scherping v. Commissioner, 725 F.2d 689 (8ᵗʰ Cir. 1983) (table) (Loren Scherping). This collection action was filed in September 1989; the case was stayed pending a criminal tax investigation of taxpayers and James Noske and Joan Noske, involving some of the entities in issue here. Taxpayers were convicted on one count of conspiracy to evade income taxes with respect to some of the transactions in issue here, which convictions taxpayers unsuccessfully appealed. United States v. Noske,, 117 F.3d 1053, 1056 (8ᵗʰ Cir.), cert. denied, 118 S. Ct. 315, 389 (1997).

After the completion of the criminal tax proceedings, the government sought to reduce to judgment taxpayers' tax assessments for tax years 1979 and 1980, and to foreclose its federal tax liens on property owned by the taxpayers and purportedly conveyed by them to the two business trusts, Epsilon and C.J.S. Ranch.

By deeds dated December 21, 1972, January 2, 1973, and January 4, 1974, Lawrence and Laura Scherping, taxpayers' parents, conveyed approximately 200 acres of farm land property to taxpayers which had a fair market value in excess of $200,000. On August 7, 1979, taxpayers transferred the same farm property to Epsilon for consideration of ten dollars ($10.00) and other good and valuable consideration. Taxpayers received shares in Epsilon. The trustees of Epsilon were taxpayers and their mother, Laura Scherping. Evidence showed that after the transfer, Loren and Jane Scherping not only continued to live on the farm property, but also farmed the property and paid insurance and all of the utility bills. Moreover, the same farm property was Epsilon's only asset and Epsilon maintained no bank account, financial records, or balance sheets and filed neither federal or state tax returns.

In October 1982 the government sent notices to taxpayers of deficiencies for tax years 1979 and 1980, asserting taxes and penalties in the amount of $94,223 against Laverne Scherping, against Loren and Jane Scherping for tax year 1979 for $33,683, and against Loren Scherping for tax year 1980 for $51,418. Taxpayers contested in tax court each of the notices and their petitions were dismissed for failure to state a

claim. The tax court noted that taxpayers were part of an unending parade of taxpayers bent on flooding the tax court's docket with frivolous claims. Thereafter, the tax court determined the liabilities and additions to the taxes as set forth in the notice of deficiencies. This court dismissed or affirmed taxpayers' appeals. Scherping v. Commissioner, 747 F.2d at 480; Scherping v. Commissioner, 725 F.2d 689. These are the same assessments which the government seeks in this suit to reduce to judgment and to collect.

Subsequent to the transfer by taxpayers and their mother of the farm property to Epsilon on January 13, 1983, taxpayers and Laura Scherping, as trustees of Epsilon, recorded two deeds dated June 15, 1982, purporting to convey the same farm property to Epsilon. Finally, by deed, reciting for consideration of $1,000 or less, Epsilon, by taxpayers and Laura Scherping, purported to convey the same farm property to C.J.S. Ranch. Epsilon received no consideration for the transfer. C.J.S. Ranch had no other assets and did not maintain a bank account. Once again, as after the Epsilon conveyance, Loren and Jane Scherping continued to live on the property, farmed it, and paid no rent.

After the completion of the criminal tax cases, the government moved to reopen this case and for summary judgment, asking the district court to order a sale of the farm property transferred by taxpayers to C.J.S. Ranch because Epsilon and C.J.S. Ranch were alter egos of taxpayers and because the transfers of the same farm property to Epsilon and C.J.S. Ranch were fraudulent under Minn. Stat. §§ 513.25 and 513.26. Taxpayers filed an opposition to the government's motion and their own affidavits. Taxpayers argued that the collection action was untimely, that Minnesota law does not allow "reverse" piercing of the corporate veil, and that the transfers to the business trusts were not sham transactions or fraudulent conveyances.

The district court granted summary judgment in favor of the government and ordered the property to be sold (not including the 240 acres owned by C.J.S. Ranch

that had been formerly owned by Laura Scherping) and the proceeds of the sale to be paid over to the government (and any excess proceeds to be paid to taxpayers after expenses and costs of sale). The district court rejected the statute of limitations argument, holding that the liens filed against C.J.S. Ranch were not assessments of tax against C.J.S. Ranch but against taxpayers and Jane Scherping. See slip op. at 6-7 (noting that the government timely filed a suit against taxpayers and that, once suit is timely filed, proceeding to judgment was not curtailed by statute of limitations). The district court also held that, under Minnesota law, the trusts were alter egos of taxpayers because there was a close identity between taxpayers and the trusts, taxpayers were not innocent individuals, and application of the alter ego theory would prevent the very sort of fraud and injustice that the alter ego doctrine seeks to avoid, and rejected taxpayers' argument that Minnesota courts would refuse to apply the "reverse" piercing-the-corporate-veil doctrine under these circumstances. See id. at 7-12. The district court also held, in the alternative, that the transfers by taxpayers to Epsilon and C.J.S. Ranch in 1979 and 1982, respectively, were fraudulent conveyances under Minnesota law. See id. at 12-15. This appeal followed.

## STANDARD OF REVIEW

This court reviews a grant of summary judgment de novo. See, e.g., Dillon v. Yankton Sioux Tribe Housing Authority, 144 F.3d 581, 583 (8th Cir. 1998). Fed. R. Civ. P. 56(c) provides that summary judgment shall be granted where the record reveals that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 246 (1986); Postscript Enterprises v. City of Bridgeton, 905 F.2d 223, 225 (8th Cir. 1990).

## STATUTE OF LIMITATIONS

First, taxpayers argue that the district court erred in holding that this action was not barred by the 6-year statute of limitations. Title 26 U.S.C. § 6502, as in effect at the relevant time, provided in pertinent part:

> (a) Length of period. -- Where the assessment of any tax imposed by this title has been made within the period of limitation properly applicable thereto, such tax may be collected by levy or by a proceeding in court, but only if the levy is made or the proceeding begun–
>
> (1) within 6 years after the assessment of the tax, or
>
> . . . .
>
> If a timely proceeding in court for the collection of a tax is commenced, the period during which such tax may be collected by levy shall be extended and shall not expire until the liability for the tax (or a judgment against the taxpayer arising from such liability) is satisfied or becomes unenforceable.

Here, it is undisputed that this collection action was timely filed within the 6-year statutory period. The government filed the notices of federal tax liens in 1984; this collection action was filed in 1989, within the 6-year statutory period, although the government failed to make effective service on C.J.S. Ranch at that time. Eight years later, in 1992, the government amended its complaint to add C.J.S. Ranch as a party. Taxpayers argue that C.J.S. Ranch was improperly added as a party because the collection was not begun against it until 1992, more than 6 years after the assessment of tax in 1984. Taxpayers argue that because C.J.S. Ranch is allegedly their alter ego, C.J.S. Ranch stands in their shoes and the government had to file the collection action

against it within 6 years. For that reason, taxpayers argue that the collection action is one against C.J.S. Ranch for primary liability and not, as the district court found, for collateral liability to collect a judgment against taxpayers. We disagree.

Taxpayers' reliance on Hall v. United States, 403 F.2d 344 (5th Cir. 1968), cert. denied, 394 U.S. 958 (1969), and United States v. Updike, 281 U.S. 489 (1930), is misplaced. We note that Hall expressly holds that § 6502 is inapplicable to bar a suit against third persons in aid of collecting a judgment against a taxpayer. See 403 F.2d at 346. Here, there is no doubt that C.J.S. Ranch is a third person. Updike held an action against transferees to be barred by the predecessor statute to § 6502 where no proceeding to collect the tax had been commenced within the statutory period, relying on statutory language regarding collection of assessments against transferees of the taxpayers (in contrast, the assessments here were against the taxpayers, not the transferees). See 403 U.S. at 492-96. As noted above, in the present case there is no dispute that the suit against taxpayers was timely filed, so Updike is inapplicable here. Moreover, neither Hall nor Updike involved an alleged third party which was found to be an alter ego of the taxpayer against whom a timely suit had been filed. Contrary to taxpayers' argument, the government did not seek to reduce to judgment any tax assessment made against C.J.S. Ranch, nor does the record anywhere include such a judgment. The district court's order reducing the assessment to judgment states that the assessments in issue are against Laverne, Loren, and Jane Scherping, and are based upon the tax court's decisions against those individuals and not against C.J.S. Ranch.

## ALTER EGO

On the merits, taxpayers argue that the district court erred in "reverse" piercing the corporate veil to hold C.J.S. Ranch liable for their individual tax liabilities. Taxpayers argue that Minnesota courts would not extend the alter ego doctrine as a creditor's remedy beyond its traditional context, that is, to hold the individual liable for corporate debts. Taxpayers argue that the two Minnesota cases applying the reverse

piercing doctrine were remedial and limited to the specific facts, citing Roepke v. Western National Mutual Insurance Co., 302 N.W.2d 350 (Minn. 1981) (Roepke) (no fault insurance), and Cargill, Inc. v. Hedge, 375 N.W.2d 477 (Minn. 1985) (Cargill) (homestead exemption). Taxpayers also argue that, even assuming Minnesota courts would extend the reverse piercing doctrine to the collection of tax, the test for application of the doctrine was not met here because there are no strong policy reasons to do so, the degree of identity between taxpayers and the trusts is less than 50%, and application of the doctrine would harm an innocent individual, taxpayers' mother, Laura Scherping. We disagree.

The government may collect the tax debts of a taxpayer from assets of the taxpayer's nominee, instrumentality, or "alter ego." See G.M. Leasing Corp. v. United States, 429 U.S. 338, 350-51 (1977); Horton Dairy, Inc. v. United States, 986 F.2d 286, 291 (8th Cir. 1993); F.P.P. Enterprises v. United States, 830 F.2d 114, 117-18 (8th Cir. 1987). In determining the economic reality of a transaction, courts must analyze the substance of a transaction and are not restricted by its form. See, e.g., Gregory v. Helvering, 293 U.S. 465, 469-70 (1935); Estate of Sachs v. Commissioner, 856 F.2d 1158, 1164 (8th Cir. 1988). While taxpayers are permitted to reduce their tax burden by any lawful means available, they are not permitted "to construct paper entities to avoid taxation when those entities are without economic substance." Chase v. Commissioner, 59 T.C.M. (CCH) 261, 264 (1990) (citations omitted), aff'd, 926 F.2d 737 (8th Cir. 1991).

When an entity is without economic substance, it may be deemed to be the "alter ego" of the taxpayer. "Alter ego means 'other self' – where one person or entity acts like, or, for another to the extent that they may be considered identical." Loving Saviour Church v. United States, 556 F. Supp. 688, 691 (D.S.D. 1983), aff'd, 728 F.2d 1085 (8th Cir. 1983) (per curiam). "Property held in the name of an entity which is the alter ego of a taxpayer may be levied on to satisfy the tax liabilities of the taxpayer." F.F.P. Enterprises, 830 F.2d at 118 (upholding finding that trusts created by taxpayers

were the alter egos of taxpayers, and therefore not separate persons apart from taxpayers).

Generally, federal courts will look to state law to determine whether an entity is an alter ego of a taxpayer. See Loving Saviour Church, 728 F.2d at 1086 (citing Aquilino v. United States, 363 U.S. 509, 512-13 (1960)). In Victoria Elevator Co. v. Meriden Grain Co., 283 N.W.2d 509, 513 (Minn. 1979) (Victoria Elevator), the court held that where a shareholder "did not treat the corporation as a separate legal entity, he should not be entitled to its protection against personal liability." In determining whether an entity is the alter ego of an individual, Minnesota courts, since Victoria Elevator, have employed a two-step analysis. In the first step, the court considers the relationship between the individual and the entity (typically a corporation), focusing on such factors as the "failure to observe corporate formalities, nonpayment of dividends, . . . siphoning of funds [by the individual], . . . absence of . . . records [for the entity], and the existence of [the entity] as merely a facade for [the individual]." White v. Jorgenson, 322 N.W.2d 607, 608 (Minn. 1982). "Disregard of the corporate entity requires not only that a number of these factors be present, but also that there be an element of injustice or fundamental unfairness." Victoria Elevator, 283 N.W.2d at 512. Thus, in the second step, the court considers the relationship between the entity and the party that seeks to disregard it; only if the entity has operated in a fraudulent or unjust manner toward that party will the entity be disregarded. See BBCA, Inc. v. United States, 630 F. Supp. 349, 351 (D. Minn. 1986) (BBCA) (noting that proof of strict common law fraud is not required) (citing White v. Jorgenson, 322 N.W.2d at 608). "[W]here the formalities of corporate [or, as in the present case, trust] existence are disregarded by one seeking to use it, . . . [the] existence [of the corporation or trust] cannot be allowed to shield the individual from liability for damages incurred by those dealing with the corporation [or for taxes owed by the individual]." Victoria Elevator, 283 N.W.2d at 512.

We hold that the district court properly concluded, based on the undisputed facts, that Epsilon and C.J.S. Ranch were sham entities created on behalf of and used by taxpayers to evade payment of their federal income tax liabilities. Indeed, taxpayers even admitted in their depositions that they, together with their mother, Laura Scherping, were trustees of Epsilon; that they received no compensation for the transfers other than shares in the trust; that Epsilon received no compensation whatsoever for the transfer to C.J.S. Ranch; that Loren and Jane Scherping continued to live on the property and taxpayers continued to farm the property, after both transfers; and that neither Epsilon nor C.J.S. Ranch had any other assets or maintained separate checking accounts.

Although taxpayers were not trustees of C.J.S. Ranch, they, together with their mother, Laura Scherping, held 100% of the beneficial interest in that trust. The trustees of C.J.S. were two South Dakota non-profit corporations, Parnell, Inc., and Armageddon, Inc., that have been repeatedly recognized as vehicles for the promotion of abusive tax shelters. See Paulson v. Commissioner, 992 F.2d 789, 790-91 (8th Cir. 1993) (per curiam) (Armageddon and Parnell were trustees of entity determined to be a sham where at trial the presidents of Armageddon and Parnell testified they had never heard of either entity and had not performed any act for these entities); Xemas, Inc. v. United States, 689 F. Supp. 917, 921 (D. Minn. 1988) (Xemas) (Armageddon and Parnell recognized as vehicles for the promotion of abusive tax shelters), aff'd, 889 F.2d 1081 (8th Cir. 1989) (table), cert. denied, 494 U.S. 1027 (1990). We note that taxpayers' criminal convictions, which related to their efforts and to the efforts of their related entities to operate in a fraudulent manner by conspiring to evade the payment of federal income taxes, combined with the tax court's holding that taxpayers' other vehicle for tax avoidance, Imperial Investment, Inc., was a sham trust, and the facts outlined above which are based on taxpayers' own statements in depositions, overwhelmingly demonstrated that Epsilon and C.J.S. Ranch were sham entities operated in a fraudulent manner vis-a-vis the government and should therefore be disregarded. See Scherping v. Commissioner, 58 T.C.M. (CCH) 1046, 1047 (1989)

(finding Imperial was a sham entity and taxpayers' alleged transfers of asserts to Imperial was a sham).

Taxpayers next argue that the reverse piercing of the corporate veil unfairly penalized the trusts for acts over which the trusts had no control. This argument, however, ignores the fact that the district court found that the trusts were the alter egos of taxpayers, and thus not separate entities. As the Fifth Circuit explained in <u>Zahra Spiritual Trust v. United States</u>, 910 F.2d 240, 243-44 (1990), "[t]he ultimate goal in a reverse piercing case is unique; rather than merely disregarding the corporate fiction and holding the shareholders accountable, the court treats the individual and the corporation as 'one and the same.'" <u>See also</u> <u>F.P.P. Enterprises</u>, 830 F.2d at 118 (upholding finding that trusts created by taxpayers were the alter egos of taxpayers, and therefore not separate persons apart from taxpayers). Taxpayers acknowledge that the present case involves reverse piercing, but they argue that the Minnesota courts would not extend the alter ego doctrine as a creditor's remedy beyond its traditional context, that is, to hold the individual liable for corporate debts. Taxpayers cite numerous cases in which Minnesota courts have rejected attempts to apply the reverse piercing doctrine as a creditor's remedy.

The government argues correctly that reverse piercing is a well-established theory in the federal tax realm. <u>See</u>, <u>e.g.</u>, <u>Zahra Spiritual Trust v. United States</u>, 910 F.2d at 243 (applying Texas law); <u>Shades Ridge Holding Co. v. United States</u>, 888 F.2d 725, 728 (11th Cir. 1989), <u>cert. denied</u>, 494 U.S. 1027 (1990); <u>Loving Saviour Church</u>, 728 F.2d at 1086 (holding that the IRS could levy on church property to satisfy the tax liabilities of its members in appropriate circumstances); <u>Cargill</u>, 375 N.W. 2d 477 (applying Minnesota law to reverse pierce in case involving homestead exemption); <u>Roepke</u>, 302 N.W.2d 350 (applying Minnesota law to reverse pierce to provide an equitable result in case involving no fault insurance). In <u>Cargill</u>, the issue was whether the owner-occupants of a farm, by placing their land in a family farm corporation, were entitled to use a reverse pierce of the corporate entity to assert a

homestead exemption from judgment creditors. While declining to adopt an equitable interest theory, the court allowed a reverse pierce to protect the owner-occupants' homestead exemption, holding that "the approach of a reverse pierce of the corporate veil may be used." 375 N.W.2d at 478, citing Roepke, 302 N.W.2d 350. The court emphasized the strong policy reason for a reverse pierce, namely, "the importance, notwithstanding the just demands of creditors, for a debtor's home to be a 'sanctuary.'" Id. at 479. In Roepke the court disregarded the corporate entity to further the purposes of no fault insurance. "Although title to six motor vehicles was in a corporation, . . . [the court] treated the vehicles as if they had been owned by the deceased, sole shareholder of the corporation, so that the decedent could be deemed an 'insured' under the no-fault policy for the purpose of survivors' benefits." Id. (discussing Roepke).

We believe that the present case meets the standards established in Cargill and Roepke. Contrary to taxpayers' argument, there are strong policy reasons for reverse piercing the corporate veil in the present case, that is, avoiding fraud and collecting delinquent federal taxes. In addition, contrary to taxpayers' argument, there is a strong degree of identity between the "guilty" individuals and the entities to be disregarded. The trusts in issue here did nothing other than hold title to real property. The district court properly looked only to the real property transferred to the trusts by taxpayers, who were hardly innocent individuals needing protection. The interests of taxpayers' mother are not harmed because, in addition to the language in the district court's order, there is an agreement in effect in which the government has agreed not to seek to collect taxpayers' liability from the property transferred by her. Thus, contrary to taxpayers' contention, the reverse pierce here does not harm any innocent individual.

## FRAUDULENT CONVEYANCE

Finally, we consider taxpayers' argument that the district court erred in holding that the transfers of the property to Epsilon and C.J.S. Ranch were fraudulent under Minnesota law. Taxpayers argue that the transfers could not have been fraudulent because they were not insolvent at the time of the transfers. Whether a conveyance may be set aside as fraudulent must be determined in accordance with state law. See Loving Saviour Church, 556 F. Supp. at 691. The Minnesota Uniform Fraudulent Conveyance Act in effect at the time of the alleged transfers to Epsilon in 1979 and to C.J.S. Ranch in 1982 was contained in Minn. Stat. §§ 513.20-.32.11 (These sections were repealed in 1986 and replaced in part with Minn. Stat. § 513.44.)

Minnesota Uniform Fraudulent Conveyance Act provided several alternative theories under which a creditor may set aside a fraudulent conveyance. The government argues that it did not seek to prove that the transfers were fraudulent conveyances under the section that required proof of insolvency, Minn. Stat. § 513.23; rather, the government (and the district court) relied on two sections, § 513.25 (conveyance by a person about to incur debt),[2] and § 513.26 (conveyance made with

---

[2]Minn. Stat. § 513.25 provided: "Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he [or she] will incur debts beyond his [or her] ability to pay as they mature, is fraudulent as to both present and future creditors."

intent to defraud),[3] in which insolvency was just one factor to be considered in determining whether a transfer was made with actual intent to defraud.

As the district court properly noted, actual intent for the purpose of § 513.26 may not be presumed. See slip op. at 13. One may establish actual intent through the examination of circumstantial evidence or "badges of fraud." Citizens State Bank v. Leth, 450 N.W.2d 923, 927 (Minn. Ct. App. 1990) (Leth) (applying Minn. Stat. § 513.44). Under Minnesota law, although the creditor bears the initial burden of proving fraud, if a creditor demonstrates sufficient badges of fraud, the burden of production shifts to the party contending that a fraudulent conveyance has not occurred. See Argonaut Insurance Co. v. Cooper, 395 N.W.2d 119, 121-22 (Minn. Ct. App. 1986) (Argonaut) (applying Minn. Stat. § 513.26); accord Xemas, 689 F. Supp. at 922 (applying Minn. Stat. §§ 513.23, 26). The badges of fraud which courts are to consider when determining actual intent include, but are not limited to: "adequacy of consideration, confidential relationship between grantor and grantee, . . . retention of possession of the property by the debtor, failure to testify or produce available explanatory or rebutting evidence when circumstances attending to transfer are suspicious," Argonaut, 395 N.W.2d at 122, failure to record the transfer or conveyance documents, prospective debts or threats of suit, and the insolvency of the debtor either before or as a result of the transaction. See Leth, 450 N.W.2d at 927. Minn. Stat. § 513.44(b) lists as factors to be considered whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit (id. § 513.44(b)(4)); whether the transfer was of substantially all of the debtor's assets (id. § 513.44(b)(5)); and whether the transfer occurred shortly before or shortly after a substantial debt was incurred (id. § 513.44(b)(10)).

---

[3]Minn. Stat. § 513.26 provided: "Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."

-14-

Here, we agree with the district court that there was sufficient circumstantial evidence that the transfers were fraudulent. It is undisputed that both transfers were made for inadequate consideration. Furthermore, taxpayers admitted that they continued to farm the property after each transfer and that Loren and Jane Scherping continued to live on the property after each transfer. As discussed above, the district court correctly found that both Epsilon and C.J.S. Ranch were taxpayers' alter egos. Thus, it is clear that taxpayers retained control over the property. See slip op. at 14. The trusts did not maintain separate financial records or bank accounts. In addition, as noted above, taxpayers made deliberate efforts to evade tax and they were found guilty of conspiracy for tax evasion. See id.

Likewise, we note that the undisputed facts show that both transfers occurred shortly before or shortly after taxpayers acquired substantial debts. It is well established that, regardless of when federal taxes are actually assessed, the United States is a creditor on the date a return is due to be filed and the taxes are required to be paid for each period. See, e.g., Hartman v. Lauchli, 238 F.2d 881, 887 (8th Cir. 1956), cert. denied, 353 U.S. 965 (1957). The tax liabilities in issue here were those for tax years 1979 and 1980. Thus, taxpayers incurred the indebtedness in issue as of April 15, 1980, and April 15, 1981, that is, shortly after the initial transfer of the property to Epsilon and shortly before the second transfer to C.J.S. Ranch. Moreover, we note that taxpayers admit that they did not file the trust agreement for Epsilon, which is the trust they contend owned the property after 1979, with the Minnesota Secretary of State until June 1982, shortly after incurring those debts. The assessments were made on September 27, 1983, shortly after the date of the alleged transfer to C.J.S. Ranch, and shortly before the recording of the deed. Moreover, the sham transfer of taxpayers' remaining assets to Imperial took place on May 24, 1983, shortly after the Tax Court dismissed taxpayers' petition for the tax years in issue here. See Scherping v. Commissioner, 58 T.C.M. (CCH) at 1047. Thus, on the undisputed facts, taxpayers engaged in an extensive pattern of transferring all of their assets shortly

before or shortly after various events occurred relating to their accumulation of substantial tax debts.

Finally, the assets that taxpayers point to to show that they were not insolvent after the transfers were their cattle and farm equipment, which they transferred to a third sham entity, Imperial, at approximately the same time of the second transfer to C.J.S. Ranch.  Consequently, taxpayers were insolvent at the conclusion of all the transfers, and they were rendered insolvent by the transfer to C.J.S. Ranch.  See Minn. Stat. § 513.42(d) (for purposes of determining the solvency or insolvency of a debtor, assets that have been fraudulently transferred are not included in the calculation of assets);  FDIC v. United States, 654 F. Supp. 794, 810 (N.D. Ga. 1986) (assets hidden from creditors not available to creditors and may not be considered in support of solvency claim).  Thus, taxpayers had no remaining assets after the transfers to the two trusts.

In sum, we hold that the present collection action was not barred by the 6-year statute of limitations, the trusts were the alter egos of taxpayers and were liable for taxpayers' tax liabilities under the reverse pierce doctrine, and the transfers to the trusts were fraudulent conveyances under Minnesota law.

Accordingly, we affirm the judgment of the district court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.